IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TIFFANI KERNS,                          )
                                        )
        Plaintiff,                      )
                                        )        Civil Action No. 1:22-cv-1200 (RDA/IDD)
v.                                      )
                                        )
RCS TRUCKING & FREIGHT, INC.,           )
                                        )
        Defendant.                      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant RCS Trucking & Freight, Inc.'s Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss").  Dkt. 7.  The Court has dispensed with oral argument as it would not aid in the decisional process.  Fed. R. Civ. P. 78(b); Loc. Civ. R. 7(J).  This matter has been fully briefed and is now ripe for disposition.  Having considered the Motion to Dismiss (Dkt. 7), together with Defendant's Memorandum in Support (Dkt. 6), Plaintiff's Opposition (Dkt. 9) and Defendant's Reply (Dkt. 10), the Court DENIES Defendant's Motion to Dismiss (Dkt. 7) for the reasons that follow.

### I. BACKGROUND[1]

#### A. Factual Background

Plaintiff Tiffani Kerns began working as a Driver Manager and Key Account Manager for Defendant RCS Trucking & Freight, Inc. on December 4, 2017.  Dkt. 1, ¶¶ 5, 14.  Robert Sturgeon is the owner and President of RCS Trucking and was Kerns's supervisor.  *Id.* ¶¶ 4, 9.  Sturgeon is also Kerns's uncle.  *Id.* ¶ 16.

---

[1] For purposes of considering the Motion, the Court accepts all facts contained within Plaintiff's Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In March of 2020, Sturgeon and Kerns travelled together on a work trip. *Id.* ¶ 17. Sturgeon had specifically requested that Kerns accompany him on this trip, which consisted of driving round-trip from Virginia to Pennsylvania to make a delivery to a client. *Id.* During the trip, Sturgeon subjected Kerns to sexually graphic remarks and explicit sexual advances. *Id.* ¶¶ 18-38. Sturgeon spent many hours talking about his sex-life during the drive from Virginia to Pennsylvania. *Id.* ¶ 18. After completing the delivery and before beginning their return trip, Sturgeon covered the in-truck camera of their vehicle. *Id.* ¶ 19. Sturgeon then continued to make sexually explicit remarks to Kerns during the hours-long drive back to Virginia. *Id.* ¶ 20.

While Kerns and Sturgeon stopped to eat lunch in the truck, Sturgeon's graphic sexual conduct escalated. *Id.* ¶¶ 21-25. During their lunch conversation, Sturgeon inquired repeatedly about Kerns's sex life:

- Sturgeon asked Kerns if she was attracted to him, what she liked to "do in bed," if she had ever "had a hookup," and the age of men she preferred to have sex with. *Id.* ¶¶ 22-23.
- Sturgeon asked Kerns to show her tattoos to him because he thought her tattoos were "sexy." *Id.* ¶¶ 21, 24.
- Sturgeon revealed that he thinks about "doing dirty things" to Kerns and that he believes she has the same thoughts too. *Id.* ¶ 25.
- Sturgeon stated that they were "both adults" and "nobody need[ed] to know" if they began having a relationship. *Id.* ¶ 28.

Kerns repeatedly and adamantly rebuffed all of Sturgeon's advances. *Id.* ¶ 27. She also told Sturgeon that his advances were "inappropriate and bizarre," especially since they are related, and repeatedly reminded Sturgeon that he is her uncle. *Id.* ¶¶ 26, 34.

Despite her emphatic rejection of his advances, Sturgeon proceeded to engage in unwelcomed touching of Kerns and continued to proposition her for sex. *Id.* ¶¶ 29-31, 35-36. Sturgeon wrapped his arm around Kerns, pulled her next to him, and told her to wrap her arm around him. *Id.* ¶¶ 29, 30. Kerns refused to touch Sturgeon and moved as far away from him as

possible.  *Id.* ¶ 31.  Sturgeon then expressly asked Kerns whether she had considered having a sexual encounter with him, and she once again denied having any sexual thoughts about him.  *Id.* ¶¶ 32-33.  Sturgeon then told Kerns that, while staying at the same hotel as her on a work trip the year prior, he considered going to her hotel room at night.  *Id.* ¶ 37.  Kerns was uncomfortable and did not respond, and Sturgeon eventually began driving again.  *Id.* ¶ 39.  Kerns was instructed by Sturgeon to never disclose the comments he made to her during the trip.  *Id.* ¶ 40.

After the work trip, Kerns's mental and physical health began to deteriorate.  *Id.* ¶ 43.  During the 3 months following the incident, Kerns was unable to avoid Sturgeon at work and began experiencing anxiety and depression as a result of Sturgeon's actions.  *Id.* ¶¶ 45, 47.  Since Kerns is diabetic, she was unable to begin taking medication for anxiety or depression due to her physician's concerns about the negative interactions the medication could have with her diabetes management regimen.  *Id.* ¶ 48.  As a result, Kerns "believed she had no choice other than to resign" from RCS Trucking in June of 2020 in order to protect her mental and physical health.  *Id.* ¶ 49.

## B. Procedural Background

Plaintiff filed this Complaint on October 22, 2022.  Dkt. 1.  Defendant filed its Motion to Dismiss for Failure to State a Claim on December 28, 2022.  Dkt. 7.  Plaintiff filed her Opposition to the Motion to Dismiss on January 11, 2023.  Dkt. 9.  Defendant filed its Reply in Support of its Motion to Dismiss on January 26, 2023.  Dkt. 10.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556). In reviewing a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). To be sure, "the [C]ourt 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc*., 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp*., 444 F.3d 312, 319 (4th Cir. 2006)). Typically, "courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015)).

### III. ANALYSIS

In her Complaint, Kerns raises two Title VII claims. First, Kerns brings a claim for hostile work environment based on sex (Count I). Dkt 1 at 7. Second, Kerns brings a claim for constructive discharge as a result of that hostile work environment (Count II). *Id.* at 8.

RCS Trucking has moved to dismiss both Counts of Kerns's Complaint. RCS Trucking first argues that Count I of the Complaint ought to be dismissed because the alleged harassment was not sufficiently severe or pervasive to constitute a hostile work environment in violation of Title VII as a matter of law. Dkt. 7 at 4-7. RCS Trucking also contends that Count II of the Complaint should be dismissed because deliberateness is a required element of a constructive discharge claim, and, according to RCS Trucking, the Complaint does not allege any facts that indicate RCS Trucking deliberately created a hostile environment in order to force Kerns to quit.

*Id.* at 7-8.  Kerns asserts that the Court should deny RCS Trucking's Motion to Dismiss and allow her to proceed against RCS Trucking on both Counts of her Complaint.  Kerns contends that she plausibly alleged facts in her Complaint sufficient to demonstrate that the harassment was pervasive or severe enough to constitute a Title VII hostile work environment claim (Count I) and that RCS Trucking acted deliberately to render her working conditions intolerable (Count II).  Dkt. 9 at 6-8.

### A. Hostile Work Environment Claim

An employee can bring a hostile work environment claim under Title VII if "discrimination based on sex has created a hostile or abusive work environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).  For such a claim to be viable, the Complaint must plausibly allege facts showing that the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult'" which "would reasonably be perceived, and is perceived, as hostile or abusive."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993) (quoting *Meritor*, 477 U.S. at 65, 67).  To meet this standard, the plaintiff must allege facts evidencing that the harassment she experienced "(1) was 'unwelcome'; (2) was based on the employee's sex; (3) was 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere'; and (4) was on same basis imputable to the employer."  *Parker v. Reema Consulting Servs.*, 915 F.3d 297, 302 (4th Cir. 2019) (quoting *Bass v. E.I. du Pont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).  "While the first element is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard."  *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009).

RCS Trucking does not contest that the first element of the claim is met.  That element—which requires Kerns to show that Sturgeon's conduct was unwelcome—is also sufficiently

evidenced by Kerns's allegations regarding her repeated rejections of Sturgeon's alleged sexual advances, *e.g.*, Dkt. 1, ¶ 27, and her explicit comments that his conduct was "inappropriate and bizarre." *Id.* ¶ 26.  Further, when Sturgeon allegedly hugged Kerns, Kerns claims that she refused to hug him back and moved as far away from him as possible, signaling her clear discomfort with the interaction.  *Id.* ¶ 31.

Furthermore, RCS Trucking does not appear to dispute that the second element is satisfied, and the Court finds that Plaintiff sufficiently pleaded that Sturgeon's discrimination was based on Kerns's sex.  A plaintiff "raises an inference of harassment in a male-female situation where the conduct is due to the explicit or implicit solicitation of a sexual encounter with the plaintiff," which is exactly what the conduct alleged here consisted of.  *English v. Pohanka of Chantilly, Inc.*, 190 F. Supp .2d 833, 843 (E.D. Va. 2002); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity.").  Finally, RCS Trucking does not deny that there is a basis for imputing liability for the conduct of Sturgeon—the owner and President of RCS Trucking as well as Kerns's supervisor—as required by the fourth element.  Dkt. 1, ¶¶ 4, 9.

In seeking dismissal of Kerns's hostile work environment claim, RCS Trucking's sole contention is that Kerns failed to plead the third element of the claim.  Dkt. 7 at 4.  RCS Trucking asserts only that the facts alleged are insufficient to show that the discriminatory conduct was severe and pervasive enough to alter the course of Kerns's employment.  *Id.* at 2.

The third element of a hostile work environment claim requires that a fact-driven discriminatory conduct allegation amounts to more than "simple teasing" or "offhand comments." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  There is no precise formula for

determining whether a work environment is "abusive" or "hostile"; such a determination can be made "only by looking at all the circumstances."[2] *Harris*, 510 U.S. at 23.  Factors relevant to the determination "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*.  The psychological harm the employee experiences is also relevant to an assessment of whether an environment is "abusive" or "hostile." *Id.*  Importantly, "no single factor is required" or dispositive for a finding of a "hostile" or "abusive" workplace. *Id.*

The crux of RCS Trucking's argument in its Motion to Dismiss is that the conduct alleged does not rise to the level of severity or pervasiveness required to sustain a Title VII hostile work environment claim.  RCS Trucking contends that Kerns's hostile work environment claim is insufficient because the alleged conduct fails to meet the threshold requirement of "repeated conduct" which "occurs over a series of days or even years" that is necessary to support a hostile work environment claim. Dkt. 7 at 5.  RCS Trucking asserts that "one-day-does-not-a Title VII-case-make" and the complained of conduct is therefore too trivial and infrequent to sustain a Title VII claim, as it spanned the scope of just one day. *Id.*

RCS Trucking's rather myopic interpretation of the principles governing hostile work environment claims has no basis in the law.  This Court acknowledges that frequency is one factor courts may consider in analyzing hostile work environment claims, and that many hostile work

---

[2] *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010*)* ("[W]orkplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context."); *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) ("To consider each offensive event in isolation would defeat the entire purpose of allowing claims based upon a 'hostile work environment' theory, as the very meaning of 'environment' is '[t]he surrounding conditions, influences, or forces which influence or modify.'").

environment claims do involve repeated conduct.  However, in accordance with the principles of Title VII case law, the Court rejects RCS Trucking's assertion that there is a dispositive threshold requirement in hostile work environment claims with regard to the frequency of conduct.

Indeed, a wealth of case law is at odds with the legal standard RCS Trucking attempts to impose.  While it is true that the Supreme Court has held that "a single act of harassment may not be actionable on its own," the Court has not held that a single act of harassment cannot *ever* be actionable on its own.  *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 103; *see Ayissi-Ethoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[S]aying that a single incident of workplace conduct *rarely* can create a hostile work environment is different from saying that a single incident *never* can create a hostile work environment.").  The Fourth Circuit, in addition to other circuit courts, has adopted this view.  *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 281 (specifically rejecting "any notion that [the Fourth Circuit's] prior decisions . . . were meant to require more than a single incident of harassment in every viable hostile work environment case"); *accord Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (similar); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) (similar).  Thus, an "isolated incident of harassment, if extremely serious, can create a hostile work environment claim."[3]  *Boyer-Liberto*, 786 F.3d at 277 (quoting *Faragher*, 524 U.S. at 788) (internal quotation marks omitted).

Since a determination as to the seriousness and severity of alleged harassment thus requires consideration of "a constellation of surrounding circumstances, expectations, and relationships," no single factor is required nor dispositive of a hostile work environment claim.  *Oncale*, 523 U.S.

---

[3] *See Ayissi-Ethoh*, 712 F.3d at 579 (Kavanaugh, J., concurring) ("The test set forth by the Supreme Court is whether the alleged conduct is 'sufficiently severe *or* pervasive'—written in the disjunctive—not whether the conduct is 'sufficiently severe *and* pervasive.'  A single, sufficiently severe incident, then, may suffice to create a hostile work environment."); *see also id.* ("The more severe the harassment, the less pervasive it needs to be, and vice versa.").

at 82; *see id.* ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.").  And here, an examination of the totality of the circumstances in this case demonstrates that Sturgeon's alleged conduct was far more severe than "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003).

While the conduct at issue here occurred over the course of only one day, that conduct was also insistent and unyielding for the vast majority of that day.  The alleged harassment persisted relentlessly and without reprieve for a significant number of hours, despite, as Kerns asserts, her explicit and consistent rejection and disapprobation of the conduct.  Dkt. 1, ¶¶ 18, 20, 36.  Thus, the conduct was far more substantial and inescapable than a few trivial "offhand comments."  *See Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding that a single public stream of obscene sexual comments made at length was sufficiently severe to intolerably alter plaintiff's work environment).

In addition to the unrelenting nature of the conduct at issue, the alleged harassment was also particularly vulgar and sordid.  The conduct alleged in the Complaint far surpasses innocuous teasing tinged with sexual innuendo or mildly offensive remarks, and closely mirrors the harassment alleged in *Jennings v. University of North Carolina*, 482 F.3d 686 (4th Cir. 2007), which the Fourth Circuit found severe enough to sustain a hostile environment claim.  Like Sturgeon, the defendant in *Jennings* "bombarded [the plaintiffs] with crude questions and

comments about their sexual activities and made comments about [the plaintiffs'] bodies that portrayed them as sexual objects."  482 F.3d at 691; *see, e.g.*, Dkt. 1, ¶ 22 (Sturgeon interrogating Kerns about her sexual activity); *id.* ¶ 21 (Sturgeon sexualizing Kerns's tattoos).  Further, like Sturgeon, the *Jennings* defendant questioned the plaintiffs about "whether, with whom, and how often they were having sex" and disclosed his sexual fantasies about the plaintiffs.  482 F.3d at 691; *see, e.g.*, Dkt. 1, ¶ 23 (Sturgeon asking Kerns what she liked to "do in bed," if she had ever "had a hookup," and the age of men with which she preferred to have sex); *id.* ¶¶ 25, 37-38 (Sturgeon divulging his sexual fantasies about Kerns).  Finally, the plaintiffs in *Jennings* alleged that the defendant touched them inappropriately, including hugging and wrapping his arms around them, which is precisely what Kerns alleges Sturgeon did to her.  482 F.3d at 692; *see, e.g.*, Dkt. 1, ¶ 29 (Sturgeon wrapping his arm around Kerns); *id.* ¶¶ 30-31 (Sturgeon attempting to get Kerns to touch him).

Thus, like the defendant in *Jennings*, Sturgeon's conduct consisted of particularly graphic sexual remarks, unwelcome touching, and persistent unwanted sexual advances.  Dkt. 1, ¶¶ 32-36. The Fourth Circuit found that this conduct was sufficient in *Jennings* to "cross the line that separates vulgarity (not actionable) from harassment (potentially actionable)."  *Baskerville*, 50 F.3d at 431; *see id.* at 430 ("On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; [and] pornographic picture[s] . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish

workers.").  The conduct alleged here is therefore commensurate in severity with conduct that the Fourth Circuit has previously deemed actionable under Title VII.[4]

Sturgeon's role within the company is also "a significant factor" here.  *Boyer-Liberto*, 786 F.3d at 278.  Sturgeon's position within RCS Trucking afforded him substantial, unchecked authority over Kerns, as he was not only Kerns's supervisor, he was also the owner and President of RCS Trucking.  Dkt. 1, ¶¶ 4, 9.  Thus, Sturgeon had "tremendous power and influence over [Kerns's] opportunity for achievement in [her career]."  *Jennings*, 482 F.3d at 696.  In addition, Kerns could not "check [Sturgeon's] abusive conduct the same way that she might deal with abuse from a co-worker."  *Faragher*, 524 U.S. at 803.  The significant power and authority that Sturgeon possessed over Kerns "invests his [] harassing conduct with a particular threatening character" and, as a result, "impacts the work environment far more severely than [if it had been the conduct of Kerns's] co-equals."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998); *Rodgers*, 12 F.3d at 675.  Consequently, this significant disparity in power significantly elevates the severity of Sturgeon's alleged conduct due to its ability to seriously alter the workplace environment for Kerns.  *See E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("[The] severity of [defendant's] conduct was exacerbated by the fact that he was not only [plaintiff's] immediate supervisor but also the sole owner of [the company].  Unlike one of [plaintiff's] fellow employees, [defendant] had significant authority over her on a day-to-day basis and the ability to influence the rest of her career.").

The physically threatening nature of Sturgeon's alleged conduct also cuts against RCS Trucking's argument that the conduct was not sufficiently severe or pervasive.  RCS Trucking

---

[4] *See also Beardsley v. Webb*, 30 F.3d 524, 528 (4th Cir. 1994) (finding a hostile work environment where plaintiff's supervisor told her he wanted to "make out" and "have his way" with her, massaged her shoulders, and asked her about intimate bodily and sexual details).

contends that the alleged conduct was not physically threatening as Kerns did not plead any facts alleging physical threats, the use of violence, or fear for her safety. Dkt. 10 at 3. But the fact that Kerns did not specifically plead facts about physical threats or violence does not necessarily mean that the facts alleged preclude an inference that Kerns felt threatened. According to the facts alleged, Kerns was alone in the car with Sturgeon on an hours-long out-of-state work trip. Dkt. 1, ¶¶ 17-18. This placed her in an isolated position where she was unable to leave Sturgeon's vicinity or cease interacting with him. Sturgeon, knowing this, allegedly proceeded to deliberately cover up the in-cab camera prior to the interaction so that his actions would not be recorded. *Id.* ¶ 19. And, during the unrecorded interaction, Sturgeon is alleged to have put his arm around Kerns, pulled her close to him, and instructed her to put her arm around him. *Id.* ¶¶ 29-30. Kerns, cornered in the truck and without the protection of bystanders who could interfere if the alleged unwelcome conduct intensified, was thus placed in vulnerable situation. Considering this context, it is a reasonable inference to draw that Sturgeon's alleged conduct and instructions—and the potential fear of retaliation if she refused to follow those instructions—was distressing and ominous to Kerns.

Kerns also claims that she refused Sturgeon's instructions and moved as far away from Sturgeon as possible. *Id.* ¶ 31. This indicates that Kerns felt unsafe remaining close to Sturgeon and did in fact feel threatened by his alleged conduct. Further, Sturgeon allegedly told Kerns never to tell anyone what he had said, which could reasonably be interpreted as a threat that he may do something to her if she did tell people about the incident. *Id.* ¶ 40. Based on these allegations and the contextual features of their conversation,[5] and drawing all reasonable inferences in Kerns's

---

[5] *See Baskerville*, 50 F.3d at 431 ("We are mindful of the dangers that lurk in trying to assess the impact of words without taking account of gesture, inflection, the physical propinquity of speaker and hearer, the presence or absence of other persons, and other aspects of context.

favor, it is reasonable to conclude that Sturgeon's actions and discriminatory intimidation would have and did cause Kerns to fear for her physical safety. *See Smith v. Union Nat. Bank*, 202 F.3d 234, 243 (4th Cir. 2000) (finding that a supervisor concluding orders to plaintiff with the remark "or else you'll see what will happen" was physically threatening); *see also Conner v. Schrader-Bridgeport Intern., Inc*., 227 F.3d 179, 198 (4th Cir. 2000) (finding that "a single powerful incident of gender-based intimidation" where defendant "slammed his clenched fist on his desk and screamed that he would fire [plaintiff] on the spot if she ever mentioned sexual discrimination again" was physically threatening).

The Court also disagrees with RCS Trucking's contention that the conduct could not have been humiliating since the interaction occurred in private without any witnesses. Dkt. 7 at 5-6. In fact, RCS Trucking's position is entirely foreclosed by the Fourth Circuit's holding in *Boyer-Liberto v. Fontainebleau Corp.*, which made it clear that harassment does not need to occur in public to be considered humiliating. In fact, the majority in *Boyer-Liberto* specifically criticized the dissent for "invent[ing] a test under which harassment cannot rise to the level of humiliating unless it is 'publicly humiliating.'" 786 F.3d at 286. The alleged harassment in this case, despite occurring in private, rises to the level of humiliating. Sturgeon's alleged conduct constituted an intrusion into one of the most—if not the most—private and personal parts of an individual's life. Kerns claims Sturgeon repeatedly interrogated her about the intimate details of her sex-life, subjecting her to a series of sexually graphic and unmistakably personal inquiries about what she

---

Remarks innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room. So too remarks accompanied by threatening gestures or contorted facial features, or delivered from so short a distance from the listener's face as to invade the listener's private space. Even a gross disparity in size between speaker and listener, favoring the former, might ominously magnify the impact of the speaker's words." (internal citation omitted)).

liked to 'do in bed,' if she had ever 'had a hookup,' and the age of men she preferred to have sex with.  Dkt. 1, ¶¶ 22-23.  Given the immense position of power Sturgeon held over Kerns, she felt compelled to answer the questions despite her discomfort with the topic.  *Id.* ¶ 22.  This coercive abuse of power intimidated Kerns into making distressing revelations of the intricacies of her private sexual conduct to her supervisor, which could certainly cause an individual to be humiliated.  *See Fairbrook*, 609 F.3d at 330 (finding conduct demeaning and humiliating when plaintiff's supervisor had bombarded her with "graphic and highly personalized comments" about her sexual activity, including "inquir[ing] about the status of her libido and [opining] that she was probably a 'wild thing' in bed").

The level of humiliation that ensued from the alleged conduct is also amplified by the precise social context in which this alleged harassment occurred.[6]  Sturgeon is Kerns's maternal uncle, and there is a deep-rooted and vehement "taboo against incest in society."[7]  Dkt. 1, ¶ 16; *United States v. Miller*, 61 F.4th 426, 431 (4th Cir. 2023).  In addition to violating fundamental social and cultural norms, incest is illegal in 48 states, including in Virginia and Pennsylvania.  Va. Code Ann. § 18.2-366; 18 Pa. Cons. Stat. § 4302.  Thus, Sturgeon's alleged attempt to get Kerns

---

[6] *See, e.g.*, *Oncale*, 523 U.S. at 81 (noting that the inquiry in harassment cases "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target"); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) ("[T]he significance of any given act . . . will often depend upon the particular circumstances. Context matters."); *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 398-99 (5th Cir. 2007) (highlighting the importance of considering context in analyzing a hostile work environment claim).

[7] *See, e.g.*, *Brewer's Lessee v. Blougher*, 39 U.S. 178, 187 (1840) ("[A]ll civilized states have looked upon incest with the greatest abhorrence."); *Smith v. State*, 6 S.W.3d 512, 519 (Tenn. Crim. App. 1999) ("[T]he incest taboo is deeply rooted in Anglo-American history and traditions."); *McKnight v. McKnight*, 2021 WL 4133970, at *4 (D. Ariz. 2021) ("[T]he taboo against incest has been a consistent and almost universal tradition with recorded proscriptions against incest existing as early as 1750 B.C."); *id.* (noting that the incest taboo "has been characterized as one of the most important human cultural developments and is found in some form in all societies").

to have sex with him was also an attempt to get her to commit an especially stigmatized criminal offense.  Feelings of humiliation, confusion, and emotional turmoil by the niece are thus the natural result of an uncle—someone who is supposed to be a safe and positive influence and mentor in her life—attempting to solicit sex from her.  Further, the Complaint alleges that Sturgeon explicitly stated that he believed Kerns harbored incestuous desires for him as well.  Dkt. 1, ¶ 25.  Such a demeaning suggestion that one was sexually attracted to and wanted to engage in sexual behavior with a biological family member would very likely engender feelings of disgust and humiliation in the victim as well.  *See Smith*, 6 S.W.3d at 519 ("[T]he prohibition against incest is directly reflective of the moral concerns of our society . . . [and] the belief that incest is a wrong against the public.").

The facts alleged also support the inference that the alleged harassment unreasonably interfered with Kerns's work performance.  When analyzing this factor, "the test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." *Harris*, 510 U.S. at 25 (Scalia, J., concurring).  "[T]he plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment.  It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to ma[k]e it more difficult to do the job." *Id.* (Ginsburg, J., concurring) (internal quotation marks and citations omitted).  Here, Kerns has alleged facts sufficient to support an inference that her working conditions had been discriminatorily altered by the alleged harassment.

Kerns claims that, following the trip to Pennsylvania, she found herself constantly anxious and under additional stress while at work.  *Id.* ¶ 44.  She asserts that, due to Sturgeon's unpredictable in-office schedule, she was unable to avoid him at work and began altering her

behavior and clothing to avoid additional harassment from him.  *Id.* ¶¶ 44-45.  Kerns also alleges that, due to a significant pre-existing medical condition, she was unable to receive treatment to combat the symptoms of depression and anxiety from which she had begun to suffer.  *Id.* ¶ 48. Given the negative impacts that mental health issues can have on many aspects of an individual's day-to-day life, in addition to the behavioral alterations Kerns felt compelled to make, it is a reasonable inference to draw that Kerns's work performance was unreasonably interfered with and affected as a result of the alleged harassment.  *See R&R Ventures*, 244 F.3d at 340 (rejecting defendant's argument that the harassment could not have unreasonably interfered with plaintiff's work performance since she had continued to work for the company and holding that conduct which caused plaintiff "to become sick at the prospect of going to work" was so severe as to discriminatorily alter working conditions).

Finally, the Complaint sufficiently pleads that Kerns experienced psychological harm as a result of Sturgeon's alleged actions, which is another factor relevant to an assessment of whether an environment is "abusive" or "hostile."  *Harris*, 510 U.S. at 23.  Kerns claims that, following the incident, her mental health steadily deteriorated and that she experienced a constant state of anxiety at work.  *Id.* ¶¶ 43-44.  Kerns alleges that she began to suffer from depression and anxiety due to the alleged harassment and had to seek medical advice for treatment of these mental health conditions.  *Id.* ¶ 47.

Considering the totality of the circumstances here, and reading the allegations in the light most favorable to Kerns (as the Court must), the Court finds that the Complaint alleges sufficient facts to state a plausible hostile work environment claim under Title VII.

B. Hostile-Environment Constructive Discharge Claim

Under the constructive discharge doctrine, an employee has a discrimination claim under Title VII when she is subjected to discrimination by her employer to the point that her "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* at 142-43. Here, Plaintiff has alleged that she was constructively discharged from RCS Trucking as a result of the hostile work environment created by Sturgeon's alleged actions. The existence of such a combined claim—referred to as "hostile-environment constructive discharge" claim—was recognized by the Supreme Court in *Pennsylvania State Police v. Suders*. *Id.* at 147. In order for a plaintiff to establish a hostile-environment constructive discharge claim, she must allege facts sufficient to satisfy the elements of both a hostile work environment claim and a constructive discharge claim. *Id.* at 146-47. With Plaintiff having met the requirements of a hostile work environment claim, the Court needs only consider now whether Plaintiff has satisfied the elements of a constructive discharge claim.

The Court must clarify the applicable standard for a constructive discharge claim, as both RCS Trucking and Kerns argued an outdated standard in their Motions. RCS Trucking's Motion to Dismiss is premised on the argument that there is a "deliberateness" requirement to establish a constructive discharge claim and that the Complaint never alleges that Sturgeon intended to force Kerns to quit. Dkt. 7 at 7-8. Kerns's Opposition relies on the contention that specific evidence of intent is not required to satisfy the deliberateness requirement, and that the appropriate standard permits a showing of subjective intent to satisfy the deliberateness requirement. Dkt. 9 at 8. Kerns argues that, under this standard, the deliberateness requirement can be satisfied by demonstrating that the employee's resignation was the reasonably foreseeable consequence of the employer's

actions and Kerns has satisfied this standard. *Id.* Both of these arguments are moot because, "as a result of intervening Supreme Court case law, 'deliberateness' is no longer a component of a constructive discharge claim." *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 235 (4th Cir. 2022); *see also EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (citing *Green v. Brennan*, 578 U.S. 547, 560 (2016)). As the Fourth Circuit has made clear, "[t]he Supreme Court now has clearly articulated the standard for constructive discharge, requiring objective 'intolerability' — 'circumstances of discrimination so intolerable that a reasonable person would resign' — but not 'deliberateness,' or a subjective intent to force a resignation." *Chapman*, 48 F.4th at 235 (quoting *Green*, 578 U.S. at 560). Since deliberateness is no longer an element of a constructive discharge claim, there is no need for Kerns to have alleged specific evidence of intent, as RCS Trucking asserts, nor for Plaintiff to demonstrate that the resignation was a reasonably foreseeable consequence of Sturgeon's harassment, as Plaintiff contends, because the "reasonably foreseeable" test is applied in the context of pleading deliberateness through subjective intent.

Instead, to state a constructive discharge claim, a plaintiff need only allege objective intolerability of the working conditions. *See, e.g.*, *Chapman*, 48 F.4th at 235. Intolerable working conditions are not established "by showing merely that a reasonable person, confronted with the same choices as the employee, would have reviewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign." *McCormack v. Blue Ridge Behav. Healthcare*, 523 F. Supp. 3d 841, 851 (W.D. Va. 2021). "Intolerability of working conditions, as the circuits uniformly recognize, is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985); *see Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981) ("An employee may not be unreasonably sensitive to his working environment. A

constructive discharge arises only when a reasonable person would find conditions intolerable."). In addition, "the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993); *see also Rankin v. Greater Media, Inc.*, 28 F. Supp. 2d 331, 342 (D. Md. 1997) ("A stress-related health condition is not sufficient proof for a claim of constructive discharge.").

RCS Trucking's Motion to Dismiss sets forth several arguments contesting the constructive discharge claim which have no basis in law.  RCS Trucking asserts that Kerns's working conditions could not have been intolerable as she continued to work for RCS Trucking following the incident. Dkt. 10 at 5.  However, that argument runs squarely against Fourth Circuit case law, which makes clear that "[t]he fact that a plaintiff continued to work under difficult conditions is to her credit, not the harasser's."  *Fairbrook*, 609 F.3d at 330.  RCS Trucking also contends that Kerns's constructive discharge claim is undercut by the fact that Kerns did not mention the incident to any co-worker or supervisor, or report the incident using RCS Trucking's Title VII incident reporting procedures.  Dkt. 10, ¶ 5.  However, reporting the alleged harassment is neither a required element of a constructive discharge claim nor material as to whether a reasonable person in Kerns's position would have felt forced to resign.[8]  Thus, whether Kerns reported the alleged incident is irrelevant to a determination as to the viability of her constructive discharge claim.

_____

[8] RCS Trucking's contention that the lack of reporting demonstrates that Kerns's working conditions were not intolerable is further undermined by the fact that courts have consistently held that a plaintiff can be subjected to severe sexual harassment sufficient to constitute a Title VII claim "and yet, for a number of valid reasons, not report the harassment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999).  The Supreme Court noted in *Faragher v. City of Boca Raton* that "an employee subject to a supervisor's sexual harassment . . . may well be reluctant to accept the risks of blowing the whistle on a superior."  524 U.S. at 803; *see also Williams*, 187

Kerns has alleged sufficient facts to permit an inference that a reasonable employee in Kerns's position would have felt they had no choice but to resign.  In addition to the severity and reprehensibility of the alleged harassment, which a reasonable person could find insufferable and of considerable difficulty to bear, Kerns alleges that her mental health steadily deteriorated following Sturgeon's alleged sexual harassment and incestuous sexual solicitation.  Dkt. 1, ¶ 43. Kerns claims that, due to Sturgeon's unpredictable in-office hours, it was impossible for her to avoid him at work.  *Id.* ¶ 45.  As a result of these conditions, Kerns alleges that she was constantly anxious at work and began to suffer from depression and anxiety.  *Id.* ¶¶ 44, 47.  While an allegation of stress-related ill health from the demands of an employee's voluntarily undertaken position is normally insufficient on its own to support a constructive discharge claim, *Spence*, 995 F.2d at 1156, Kerns does not allege that her ill-health is the result of the ordinary demands of her position.  Rather, Kerns alleges that she is experiencing health difficulties as a result of being sexually harassed by her biologically related superior, which is certainly not one of the demands she voluntarily undertook when she accepted her position at RCS Trucking.

Furthermore, Kerns does not allege that it is the mere development of stress-related ill health alone that mandated her resignation.  Kerns has diabetes, a very serious pre-existing health condition that, if not properly treated, can lead to several life-affecting complications or even death.  Dkt. 1, ¶ 46.  Kerns alleges that the additional stress she was placed under at work as a

---

F.3d at 566 ("[Plaintiff's] reluctance to report the incidents is entirely understandable considering that one of the alleged aggressors was her supervisor and she wanted to get along at work.").  The Court explained that "[w]hen a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose 'power to supervise-[which may be] to hire and fire, and to set work schedules and pay rates-does not disappear . . . when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion."  *Id.* (quoting Estrich, *Sex at Work*, 43 STAN L. REV. 813, 854 (1991)).

result of having been explicitly, impliedly, and repeatedly sexually propositioned by her uncle made it difficult for her to control her blood sugar, which is essential to the proper treatment of her condition.  *Id.*  As a result of Sturgeon's allegedly sporadic in-office hours, Kerns contends that she was unable to manage this anxiety by avoiding him in-office.  *Id.* ¶ 45.  In addition, as owner and President of RCS Trucking, Sturgeon's continued presence at the company and in the office is essentially guaranteed.  *Id.* ¶ 45.  Unable to eliminate future interactions with Sturgeon, Kerns claims that she sought advice from her doctor about medical treatment for her depression and anxiety.  *Id.* ¶ 47.  However, Kerns asserts that she was advised against taking medication due to her doctor's concerns about negative interactions between the medication and her current diabetes management regimen.  *Id.* ¶ 48.  Consequently, Kerns was also unable to manage the detrimental effects of her depression and anxiety through medication.

These alleged facts are material to the Court's determination because a constructive discharge in violation of Title VII may be found where an employer "place[d] an employee in a position that jeopardized his or her health."  *Spence*, 995 F.2d at 1156; *see Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 374 n.3 (5th Cir. 1981) (finding constructive discharge where plaintiff "faced a reasonable probability of injury to herself" if she continued to work in her position and holding that "[t]his probability of injury was an intolerable situation, and Plaintiff was compelled to resign involuntarily").  Here, due to her pre-existing diabetic condition and the effect of her working conditions on her ability to control her blood sugar, Kerns alleges her physical health was also placed in jeopardy.  Dkt. 1, 43, 46.  Unable to manage the anxiety and depression that were affecting her blood sugar levels by medication or a change in her work environment, Kerns contends that her only option to safeguard her physical and mental health was to eliminate external stressors, *i.e.*, resign.  *Id.* ¶¶ 48-49.  Thus, facing a reasonable probability of injury—with the

potential for severe repercussions—if she continued to work for RCS Trucking, a 'reasonable person' in Kerns's position would have felt forced to resign because of this intolerable situation.

Furthermore, contrary to RCS Trucking's Memorandum in Support, Kerns's lack of reporting actually augments her claims about the intolerability of her working conditions.  In this case, Sturgeon's superior position and authority over Kerns extended far beyond that of just a supervisor.  In addition to being Kerns's supervisor, Sturgeon is also the owner and President of RCS Trucking—the two most powerful positions in the company.  Dkt. 1, ¶¶ 4, 9.  These positions grant Sturgeon virtually unchecked authority and direct control over every employee—and the trajectory of their career—at RCS Trucking.  This makes it unlikely that there would be any individual within the company that would have the power, or willingness, to monitor and supervise all aspects of Sturgeon's day-to-day activities, interactions, and conduct.  A reasonable person in Kerns's position could therefore believe, as Kerns alleged she did in her Complaint, that Sturgeon's status within the company would render any complaint she could make about the alleged conduct futile.  Dkt. 1, ¶ 42.  In addition to the unavailability of an effective remedial scheme, Sturgeon allegedly instructed Kerns at the end of the interaction that she was *never* to tell anyone what he had said to her in the truck.  *Id.* ¶ 40.  Given this threatening assertion which essentially prohibited Kerns from reporting the incident, *see supra* page 12 and cases cited, coupled with Sturgeon's immense power over any supervisor or employee to whom she might report the conduct, a reasonable person in Kerns's position would have felt that there was no relief to be obtained in the workplace and that they had no choice but to quit.

Thus, assuming all of Kerns's allegations are true, as the Court must at this stage of the litigation, the Court finds that Kerns has alleged sufficient facts to demonstrate that a reasonable

employee in Kerns's position would have felt compelled to resign.  Thus, her Title VII constructive discharge claim will survive RCS Trucking's Motion to Dismiss.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 7) is DENIED.

It is SO ORDERED.

Alexandria, Virginia
July 31, 2023

/s/

Rossie D. Alston, Jr.
United States District Judge